**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | |
|---|---|
| **WALI JAHANGIRI, M.D.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Case No: 7:21-cv-00427** |
| **LEWISGALE MEDICAL CENTER, LLC** | ) |
| **d/b/a LEWISGALE MEDICAL CENTER,** | ) |
| | ) |
| **Defendant.** | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff files this Brief in Opposition to Defendant's Motion for Summary Judgment.

**Statement of Facts**

**Dr. Jahangiri, a Muslim born in Pakistan, went to work for LewisGale in summer 2018.**

1. Dr. Jahangiri is a South Asian, Muslim male born in Abbottabad, Pakistan. Ex. 37, ¶2.

2. Dr. Jahangiri's first day on the job at LewisGale in LewisGale's internal medicine residency program was approximately July 1, 2018. Ex. 37, ¶3.

3. At LewisGale, the Program Director ("PD") hires resident employees, and the Designated Institutional Officer ("DIO") terminates resident employees:

> Q   Were there any positions or physicians at LewisGale while you were the DIO that you had hire or fire power for?
> A    Ultimately, I do not hire any residents; that's the prerogative of the program directors. Within HCA, the final say, the final arbiter over decisions to terminate a resident lies with the DIO.

Ex. 3, Ellsworth, at 12:13-20.

4. Dr. Arsura was the PD who interviewed Dr. Jahangiri. Ex. 1, Jahangiri, at 27:7-11. Dr. Griffin later became the PD, but he did not interview Dr. Jahangiri. Ex. 7, Griffin, at 17:10-11.

1

5.  LewisGale prefers hiring residents who have attended United States schools. Ex. 12, Martin, at 19:7-12; Ex. 48, King Affidavit; Ex. 2, Griffin, Rule 30(b)(6), at 27-28 (hiring criteria starting in 2018 was up to Dr. Griffin and he implemented restrictions on Caribbean schools).

6.  Dr. Ellsworth was the DIO when Dr. Jahangiri's employment was terminated. Ex. 3, Ellsworth, at 12:18-23.

7.  During Dr. Jahangiri's employment, the PD, DIO, and most of the attending physicians were Caucasian. Ex. 37, ¶4.

8.  LewisGale's residency employment program is three years, which is comprised of three one-year contracts. Ex. 2, Rule 30(b)(6), Griffin, at 6:10-19.

**Year One: Dr. Jahangiri received ratings in line with his peers. The only difference between Dr. Jahangiri and others was that Dr. Haney, a Caucasian attending physician, claimed that Dr. Jahangiri thought women should cook and clean for him. Two female Muslim co-workers, Sara Malik and Huma Khan, voluntarily spoke with Dr. Haney to reassure her, but Dr. Haney continued her baseless accusations.**

9.  Dr. Jahangiri's first-year score on his Internal Medicine exam was 56%, putting him in the 24% percentile, above 1/3 of his class. Ex. 31. In 2019, Dr. Jahangiri scored a 72%, which put him in the 57th percentile, and right in the middle of his class. Ex. 32.

10. During his first year of employment, Dr. Jahangiri received ratings that were in line with other first year residents. All residents have areas marked to improve on: this is the purpose of the residency employment program. *E.g.*, *Compare* other residents: Ex. 39, at LGMC-WJ 1108-1111 (evaluation scores of 1-3; concerned that he pushes back when challenged; knee-jerk on testing); 1120-1121 (not giving enough personal space to patients and speech is too rapid); 1144-1145 (orders too much testing; he needs to keep reading); 1164-1165 (main problem is consistency; needs to work on projecting same level of empathy for all patients; and she is inattentive to patient inquiries); 1173-1174 (interaction lacks eye contact; he is disorganized and wandering); 1175

(don't stand—intimidated patient); 1182-1183 (needs help with organization and knowledge base

is lacking)), *to* Dr. Jahangiri:

- Ex. 13, at LGMC-WJ 775-776: Dr. Coppedge, 9/9/18 (completed 9/24/18), rating Dr. Jahangiri at level 3-4

- Ex. 13, at LGMC-WJ 805-806: Dr. Draper, 12/23/18 (completed one year later, 12/17/19); enjoyed working with him; appropriate care; knowledge is what is excepted at this time; more patients than usual said they appreciated his care; noticed some friction between Jahangiri and other staff members but no red flags; needs to continue working on interpersonal interactions but he has seen significant improvement since his first evaluation

- Ex. 13, at LGMC-WJ 807-808: Dr. Pendergrast, 12/23/18 (completed 1/22/19); enjoyed working with him; improvement in interpersonal skills has been dramatic; responded to feedback well; still room for improvement, but doing much better

- Ex. 13, at LGMC-WJ 810-811: Dr. Somorin, 3/3/19 (completed 3/11/19); enjoyed working with him; always trying to improve himself; takes well to constructive criticism; displays genuine effort to be a better communicator and doctor

- Ex. 13, at LGMC-WJ 822: Dr. Griffin, 5/22/19; high end of satisfactory

- Ex. 13, at LGMC-WJ 836-837: Dr. Kashyap Patel, 7/21/19 (completed 10/22/19); working hard; improved quite a lot during the rotation; helpful to coworkers and always ready to get more patients which is a great quality to have in a resident

- Ex. 13, at LGMC-WJ 843-845: Dr. Lindsay Jane, 8/18/19 (completed 8/19/19); rating Dr. Jahangiri at level 5; really enjoyed working with him, best 2nd year resident she has worked with so far; kind and supportive

- Ex. 13, at LGMC-WJ 849-851: Dr. Avan Al-Jaf, 9/8/19 (completed 9/9/19); rating Dr. Jahangiri at level 5; very respectful and knowledgeable

11. Despite normal ratings and feedback from other doctors, Dr. Jennifer Haney, a Caucasian

attending physician, took a (negative) interest in Dr. Jahangiri. She commented without cause that

Dr. Jahangiri did not treat women with respect and that he was sexist, rhetorically stating at one

point, "What does Wali expect . . . for women to cook and clean for him?" Ex. 1, Jahangiri, at

117:18 to 119:1. Dr. Jahangiri was offended by this accusation, as his family contains many

professional women, including professors, doctors, and attorneys. Ex. 1, Jahangiri, at 119:1-3; Ex.

37, ¶ 6. Moreover, Dr. Jahangiri was recommended to LewisGale with glowing recommendations

from both females and males with whom he had worked. Ex. 53.

12. Two female Muslim co-workers, Sara Malik and Huma Khan, voluntarily spoke with Dr. Haney to reassure her that Dr. Jahangiri neither disliked nor mistreated women, but Dr. Haney dismissed their comments and continued her baseless accusations. Ex. 37, ¶ 7.

13. As discussed further herein, Dr. Haney, an attending physician who had unsuccessfully attempted to pass her boards, Ex. 4, Haney, at 9-10, gave Dr. Griffin an easy go-to when Dr. Griffin needed something negative about Dr. Jahangiri to support actions he wanted to take. Dr. Haney was poorly rated by the residents that she was supposed to be supervising (Ex. 40 (on flash drive), "Lacks experience. Puts in orders. Sexist." "[does] not have enough knowledge/skills to supervise" "let's you run the show, but not much educational input").

**Year Two: Dr. Jahangiri acknowledged his Muslim faith in a meeting with residents and nurses in the ICU; Dr. Jahangiri was suspended shortly thereafter because he was perceived as a terrorist who might blow up the ICU. LewisGale called the Salem Police Department and reported that LewisGale was not trying to profile, but that it was particularly concerning that Dr. Jahangiri is Pakistani, with a thick accent, noting at deposition that Dr. Jahangiri "potentially could have ties with areas that currently have terrorist activities." No charges were brought by the police because Dr. Jahangiri did not commit a crime, and HCA Legal had to step in after Dr. Jahangiri retained counsel to return Dr. Jahangiri to work. Dr. Jahangiri reported that he had been targeted due to being a Pakistani Muslim; Dr. Ellsworth never investigated the complaint because he did not feel like Dr. Jahangiri's concerns were valid.**

14. During Dr. Jahangiri's second year of employment, Dr. Jahangiri became more open about his background and acknowledged his Muslim faith in a meeting with residents and nurses in the Intensive Care Unit ("ICU"). Ex. 37, ¶5.

15. Shortly thereafter, on approximately September 21, 2019, one of the ICU nurses, Helena Tilley, who describes herself as a white, Christian American, Ex. 8, Tilley, at 5:19-25, overheard Dr. Jahangiri sarcastically state to himself after a long stressful day: "I want to die," as he was taking a seat in front of his computer to write notes on a critical ICU patient. Ex. 1, Jahangiri, at 270:5-9. While Dr. Jahangiri's comment was clearly figurative, RN Tilley, who was sitting beside

Dr. Jahangiri, stated to Dr. Jahangiri, a South Asian Muslim male: "You're not going to shoot up the ICU, are you?" Ex. 1, Jahangiri, at 270:14-20. Dr. Jahangiri, dismissed her inappropriate and absurd remark by saying, "Yeah, sure, whatever." Ex. 1, Jahangiri, at 270:21-271:1.

16. A few days later, on September 23, 2019, Dr. Jahangiri received a text from Dr. Griffin asking him to come to his office. Ex. 1, Jahangiri, at 272:4-8; Ex. 49. Upon arrival, Dr. Griffin said, "[p]eople are saying that you're going to shoot up the hospital." Ex. 1, Jahangiri, at 272:9-11; *see also* Ex. 7, Griffin, at 68. Soon thereafter, Dr. Griffin was joined by Dr. Ellsworth. Ex. 1, Jahangiri, at 273:17-19. Dr. Jahangiri, confused, was then removed from LewisGale with security present, even though by LewisGale's admission, his demeanor was "acceptable." Ex. 9, RFA 27.[1]

17. Drs. Griffin, Ellsworth, and HR then met with LewisGale Security Officer Derek Wheeler to provide information about Dr. Jahangiri to share with the police. Ex. 6, Wheeler, at 24-27.

18. Armed with the misinformation provided by Drs. Griffin, Ellsworth, and HR, Wheeler then called Salem Police Department and reported, "threats about bombing and shooting – suspect is a physician." Ex. 41, at 799. When the police arrived, Wheeler informed the police within the first 15 seconds of the recorded conversation, "that's the thing that, it is really unnerving to us is, umm, I'm not trying to profile, but he is Pakistani." Ex. 38 (on flash drive). Wheeler had never met nor spoken to Dr. Jahangiri himself, Ex. 37, ¶17; this information came from LewisGale. Ex. 6, Wheeler, at 27:6-28:6. Wheeler testified that he noted Jahangiri's country of origin because

---

[1] Plaintiff served the RFAs on Defendant on January 25, 2022 (Ex. 9; *see also* Dkt. No. 24, Section III, ¶ E, agreement to serve discovery requests by electronic means). Defendant did not provide responses. "The consequence of not filing timely objections or answers to requests for admissions under Federal Rule of Civil Procedure 36 is clear. Rule 36 states: 'A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter.'" *Montoya v. Daisy Fresh Cleaning Co.*, Civil Action No. 1:19-cv-1264 (RDA/TCB), 2020 U.S. Dist. LEXIS 226042, at *4 (E.D. Va. Apr. 22, 2020) (quoting Fed. R. Civ. P. 36(a)(3)).

Dr. Jahangiri "potentially could have ties with areas that currently have terrorist activities." Ex. 6, Wheeler, at 22-23. Wheeler also told the officers that Dr. Jahangiri had a thick accent, which was information provided to him by LewisGale. Ex. 38; Ex. 6, Wheeler, at 26:23-27:5.

19. Dr. Griffin told the police that the hospital was going to pursue termination of Dr. Jahangiri. Ex. 41, at 810.

20. On September 24, 2019, Dr. Jahangiri received a letter at his home address notifying him that he was suspended from employment, but he was not notified of his right to appeal the suspension under Section XII of the GME Manual. Ex. 14, LGMC-WJ 725. He was given no guidance, but instead told to stay off LewisGale property. *Id*. He sought legal counsel, and his attorney emailed Dr. Griffin that afternoon to set up a meeting, stating that "Wali is ready to answer any question you may have and would like to do so at your earliest convenience." Ex. 15, LGMC-WJ 0722. Dr. Jahangiri also met with Dr. Mukesh Patel, a psychiatrist appointed by LewisGale, and psychologist Sam Rogers, who both confirmed that Dr. Jahangiri was no threat to himself or anyone else. Specifically, Dr. Patel produced a written statement on September 27, 2019:

> Wali Jahangiri has been my patient since October 2018. And as recent as September 24[th,] he was seen by me along with his mother. At the present time as per my clinical assessment I do not see Wali as danger to himself or others from psychological point of view. I have specifically asked him in context of questions about "shooting." To my knowledge he does not own the gun.

Ex. 16, LGMC-WJ 727; Ex. 9, RFA 28. Likewise, Dr. Rogers met with Dr. Jahangiri on September 24, and produced the following statement.

> I am a Licensed Clinical Psychologist in practice at Psychological Health – Roanoke. I have met with Dr. Jahangiri 22 times since 1/5/19. My latest session with Dr. Jahangiri was on 9/24/19. I think that in that time I have come to know Dr. Jahangiri quite well and I can state unequivocally that he is not at risk for hurting himself or anyone else.

Ex. 17, LGMC-WJ 728; Ex. 9, RFA 29.

21. On September 27, 2019, at the behest of Dr. Jahangiri's attorney, Paul Beers, Dr. Ellsworth and Regina Mabe, HR, agreed to meet Dr. Jahangiri and Beers. Despite it being a very important meeting, Dr. Ellsworth did not record the meeting, did not take any notes, and Mabe apparently did not take notes either. Ex. 3, Ellsworth, at 36, 39, 42. Dr. Ellsworth estimates the meeting at Panera lasted about one hour, but the only conversation he claims he can recall was his explanation to Dr. Jahangiri that he was conducting an investigation and Dr. Jahangiri stating that he said he "want[ed] to die," but that he never said "he was going to get people." Ex. 3, Ellsworth, at 39-40. Dr. Ellsworth told Dr. Jahangiri, "Dr. Griffin wants you gone." Ex. 1, Jahangiri, at 281:9-10. Dr. Ellsworth told Dr. Brian King that "[i]f it were up to me, I would fire him." Ex. 48, ¶14.

22. That same day, on September 27, 2019, Wheeler told the police that Dr. Jahangiri "had been terminated at approximately 12:30pm. Speaking with Wheeler further, he advised that JAHANGIRI made no[] threatening statements [n]or display[ed] any acts of aggression." Ex. 41, at 810.

23. On September 30, 2019, Dr. Jahangiri, through his counsel, challenged the suspension, reporting that the "suspension is based on impermissible stereotypes concerning persons of Pakistani heritage, national origin or ethnicity who adhere to the Islamic faith." Ex. 18.

24. Vickie Richardson, HR Business Partner II, testified that a resident may report discrimination to his supervisor, who must report the allegation to HR so that HR can investigate. Ex. 10, Rule 30(b)(6), Richardson, at 8:10-19; 9:12-24. Richardson testified that "[e]very complaint is investigated," and agreed that it is never appropriate for a complaint of discrimination to be screened out as not meritorious or worthy of investigation. Ex. 10, Rule 30(b)(6), Richardson, at 10:3-9. Dr. Ellsworth, the recipient of the complaint from Attorney Beers, was Dr. Jahangiri's supervisor, yet there was no investigation of Dr. Jahangiri's complaint because Dr. Ellsworth

"didn't feel like the allegations were valid." Ex. 2, Rule 30(b)(6), Griffin, at 108:7-109:2.

25. Even though as of September 25, 2019, the police determined that there was "Not a Crime," Ex. 41, at 806, Dr. Griffin called the police to update them on October 16, 2019, stating that "HCA's attorneys have gotten involved with the decision of the disciplinary board…[and] [a]t this time JAHANGIRI would be allowed to return to HCA as an employee." Ex. 41, at 811.

**After being labeled as a terrorist by LewisGale, Dr. Jahangiri was treated as a terrorist by his coworkers. Dr. Jahangiri was reprimanded for calling out discrimination.**

26. After Dr. Jahangiri was permitted to return to work, he was subjected to ongoing discrimination and retaliation. Ex. 50. Dr. Ellsworth informed Dr. Jahangiri's attorney that the nurses in the ICU were awaiting Dr. Jahangiri's return wearing bullet-proof vests. Ex. 37, ¶ 15; Ex. 3, Ellsworth, at 50:8-11. One employee made a comment involving an "Uzi" and another made sounds imitating the firing of a submachine gun. Ex. 37, ¶ 15. Caucasian females claimed, without basis, that they were afraid of Dr. Jahangiri. Ex. 37, ¶ 15.

27. Dr. Jahangiri also witnessed patients being subjected to discrimination and neglect, and he reported it. When Dr. Jahangiri reported an African American patient who was without necessary IV fluids to the Patient Care RN in the ER, Dr. Jahangiri was reprimanded by the senior teaching physician, Dr. Cortorreal, for "criticizing" the nurses' performance. Ex. 1, Jahangiri, at 247-248. Dr. Cortorreal in turn reported this to Dr. Jahangiri's direct supervising attending, Dr. Kevin C. Coppedge, and Dr. Jahangiri was negatively evaluated by Dr. Coppedge for making this protected report. Ex. 1, Jahangiri, at 248-249.

**LewisGale's explanation of its Remediation Policy, and its recitation of the supposed multiple attempts to remediate Dr. Jahangiri is inconsistent with the evidence. Dr. Jahangiri was placed on remediation once, and he successfully completed remediation long before his termination. Leadership only placed Pakistani residents on remediation.**

28. According to the GME Resident and Fellow Manual, residents "may undergo remediation,

which allows for a correction of deficiencies that require intervention." Ex. 19. According to the manual, remediations are initiated by the Clinical Competency Committee ("CCC"), which is charged with identifying a resident with deficiencies. *Id.*; Ex. 7, Griffin, at 37:10-20. The CCC then reviews evaluations and other "relevant data," designs a remediation plan, identifies a mentor, and develops a mentoring meeting timeline. Ex. 19. After this plan is in place, the program director meets with the resident to explain the remediation, the two sign the document, and copies of the remediation plan are filed with the GME office. Ex. 19. The mentor meets regularly with the resident and submits a progress report to the program director. Ex. 19. The CCC then reviews the progress report and determines whether the resident (1) has successfully completed remediation; (2) requires continued mediation; or (3) requires corrective action. *Id.* According to the GME Manual, there are four possible corrective actions: Administrative Leave, Suspension, Renewal without Promotion, or Termination. Ex. 3, Ellsworth, at 56-57.

29. "Leadership…disproportionately discipline[d] people of Pakistani or Muslim origin." Ex. 1, Jahangiri, at 120:10-14; Ex. 48, Dr. King Affidavit (Dr. King's affidavit sets forth numerous examples of South Asian Muslim resident employees being treated much worse than Caucasian resident employees). Between 2018 and 2021, Dr. Griffin placed three residents on remediation; all were of Pakistani national origin. Ex. 7, Griffin, at 45:1-47:11.

30. When non-minority residents had similar problems, they were not put on remediation. For example, Dr. Griffin received complaints about Justin Lindsey's inappropriate communication from multiple residents. Specifically, Dr. Haney and Dr. Malik complained directly to Dr. Griffin about Dr. Lindsey's disrespectful interactions with them, yet Lindsey was not remediated. Instead, Dr. Griffin had a conversation with Lindsey, exhorting him to "have better self awareness." Ex. 7, Griffin, at 47:12-20, 48:6-24, 49:9-50:1; Ex. 4, Haney, at 12:14-15:5. In fact, as a result of making

9

a complaint about Dr. Lindsey, Dr. Malik was transferred to another team, and nothing happened to Lindsey. Ex. 45, Haney, at 14:19-25.

31. Nicholas Karo was described as "highly insulting" and "very disparaging" in his communication with interns, yet Dr. Griffin had no recollection of having any conversation with Karo about his communication, much less putting him on remediation. Ex. 7, Griffin, at 116:1-15.

32. Dr. Jahangiri's record contains one incident of remediation as described in the GME Manual. Ex. 7, Griffin, at 40:3-6. He received a remediation plan on November 11, 2019, Ex. 20, very soon after he was returned to work by legal when he was alleged to in essence be a terrorist.

33. When the CCC met in January 2020, the committee was happy with Dr. Jahangiri's progress: He needed to improve "his interpersonal communication skills and professionalism . . . and he had done so." Ex. 5, Nelson, at 67. The Committee notified Dr. Jahangiri by letter that

> After reviewing the record and considering the conclusions by the faculty that worked with you during this time, it is the conclusion of the committee that you have successfully completed your remediation. . . You are to be commended on the effort you put into this process.

Ex. 33.

34. After completing remediation on January 31, 2022, Dr. Jahangiri positive evaluations and was never placed back on remediation. Ex. 37, ¶ 10.

**LewisGale renewed Dr. Jahangiri's contract, providing Dr. Jahangiri a signed Year 3 Contract, and Dr. Jahangiri returned the fully executed Year 3 Contract to LewisGale.**

35. When the CCC met on June 3, 2020, they discussed the residents individually, and determined to offer renewed contracts to all residents, including Dr. Jahangiri. Ex. 7, Griffin, at 61. Zac Martin was present and taking notes, Ex. 56; the following day, he sent a text to Dr. Jahangiri, letting him know that he had the Y3 contract for Dr. Jahangiri to pick up. Ex. 11, Rawlins, at 51; Ex. 12, Martin, at 26; Ex. 34.

36. On June 11 or 12, Dr. Nelson, on behalf of the CCC, coordinated a visit with Dr. M. Patel, to determine the best course of action for Dr. Jahangiri's third year; the CCC was not "considering nonrenewal." Ex. 12, Martin, at 74. Dr. Jahangiri was slated to join Dr. Haney's team as a third-year resident, and to spend September and October of 2020 with Dr. Nelson in Gastroenterology. Ex. 4, Haney, at 120; Ex. 5, Nelson, at 59; Ex. 51, Schedule. Dr. Nelson was looking forward to mentoring Dr. Jahangiri. Ex. 5, Nelson, at 59-60.

**Dr. Griffin and Dr. Ellsworth overruled the CCC, determining to end Dr. Jahangiri's tenure at LewisGale. Evidence and deposition testimony dispute LewisGale's assertion that the CCC was on board with not renewing Dr. Jahangiri's contract.**

37. Despite 6 months of positive feedback from January-June 2020, Ex. 37, ¶10, and despite the CCC's plans for Dr. Jahangiri for the third and final year of employment, Dr. Griffin fired Dr. Jahangiri, which Dr. Ellsworth upheld. *See* Ex. 7, Griffin, at 61.

38. Dr. Griffin testified that to support his decision to "not renew" Dr. Jahangiri's contract (terminate Dr. Jahangiri's employment), he was sent a "packet of documents" from things that "[Haney and Lindsey] saved." Ex. 7, Griffin, at 53-54. Dr. Griffin testified that he also created a document about these things, but that he didn't know where it was. Ex. 7, Griffin, at 55.

39. According to Drs. Ellsworth and Griffin, they allegedly brought the matter before the CCC and "a recommendation was made not to renew" Dr. Jahangiri's contract. Ex. 9, RFA 30; Ex. 3, Ellsworth, at 73 (decision was made "in concert with feedback from the Clinical Competency Committee"). Dr. Ellsworth testified that the CCC produced feedback in the form of "[a] summar[y] by Joe Nelson" which said that "after review of his performance, it was the opinion of the Clinical Competency Committee that Dr. Jahangiri could not be successful going forward in internal medicine." Ex. 3, Ellsworth, at 73-74. However, no such document has been produced in this case, and in his deposition, Dr. Nelson testified he did not create such a document: "I was

11

never asked to draft a document to that effect and I, quite honestly, personally never saw a document to [that] effect." Ex. 5, Nelson, at 76.

40. Dr. Griffin has a clear pattern of either acting on his own, and when that is not enough, resorting to Dr. Haney to be able to issue discipline to Dr. Jahangiri, when the contemporaneous data does not support discipline. For example:

   a. Dr. Jahangiri's record of his first two months at LewisGale is devoid of negative comments. His reviews indicate that he was "seeking feedback" and was "working hard." Ex. 21. On September 6, 2018, however, Dr. Griffin penned a memo accusing Dr. Jahangiri of having "behavioral problems since July 2018." Ex. 22. Aside from this memo, there is nothing in the record about these alleged "behavioral problems."

   b. On December 3, 2018, Dr. Griffin wrote a memo to the CCC alleging that "[Jahangiri's] formative milestone evaluations show he is still struggling in areas of system-based practice and professionalism, and the comments suggest he is still at remedial level." Ex. 24. The CCC, meeting on December 11-12, 2018, found that "some info [about Dr. Jahangiri was] not accurate [and that he] has been fulfilling the requirements" and that Dr. Jahangiri lacked proper teaching support. Ex. 25, at LGMC-WJ 2730- 2731.

   c. While Haney regularly communicated with Dr. Griffin and provided evaluations upon his request, she did not fill out a MedHub evaluation for Dr. Jahangiri until December 2019, halfway through his second year, Ex. 26, and she ignored Dr. Jahangiri's requests for feedback until June 2019. Ex. 27; Ex. 37. ¶8. Then, on June 11, 2019, *at the request of Dr. Griffin*, Dr. Haney submitted an evaluation of Dr. Jahangiri, urging that Dr. Jahangiri not be promoted. Ex. 28. Dr. Griffin did not ask Dr. Haney to do an informal email evaluation of any other resident. Ex. 4, Haney, at 20:2-4.

   d. On June 14, 2019, Dr. Griffin drafted a memo which begins with a negative evaluation of Dr. Jahangiri based allegedly on his rotations with Dr. Haney, but Dr. Griffin makes no mention of his own direct evaluation of Dr. Jahangiri only weeks prior, in which he had rated Dr. Jahangiri on the "high side" of satisfactory. Ex. 7, Griffin, at 88-89; Ex. 13, at LGMC-WJ 822. Dr. Griffin also ignored the plethora of evaluations that indicated that Dr. Jahangiri was "efficient w/ tasks," Ex. 36, at LGMC-WJ 799, "promptly address[ed] issues," Ex. 36, at LGMC-WJ 809, and "show[ed] up every day and was on time," Ex. 36, at LGMC-WJ 823.

   e. There are no documented meetings between Dr. Griffin and Dr. Jahangiri between June 20, 2019, and September 16, 2019. The next mention of Dr. Jahangiri by Dr. Griffin is in Dr. Griffin's September 25, 2019 memo, entitled "Summary of Remediation for Wali Jahangiri, MD," which he produced at Dr. Ellsworth's request, as the two sought to lay the groundwork to terminate Dr. Jahangiri after he was falsely accused of making a terrorism threat.

     f.   Then, Dr. Jahangiri was returned to work at the direction of legal. He was placed on remediation, which he passed, and then he was positively evaluated thereafter. Ex 37, ¶10. Yet, 6 months later, at the end of that contract year, Dr. Griffin and Dr. Ellsworth overrode the CCC and terminated Dr. Jahangiri's employment.

**By waiting until June 15, 2020, to announce its decision to terminate Dr. Jahangiri, LewisGale violated the notice provision of Dr. Jahangiri's second year contract.**

41. Dr. Jahangiri's second-year contract ("Y2 Contract") stated that "in the event that the academic and professional performance by the Resident is determined to be unsatisfactory, subject to the provisions of due process set forth in the GME Resident Manual . . . Hospital shall provide . . . as much notice as circumstances reasonably allow, prior to the end of the Agreement" that the Resident's contract will not be renewed. Ex. 42.

42. The GME Resident Manual agrees that "when a resident or fellow will not be promoted to the next level of training, the program must provide the resident or fellow with as much written notice as possible." Ex. 43, p. 20.

43. On June 15, 2020, only fifteen days before the conclusion of his Y2 Contract, and after the parties had a fully executed Y3 contract, Dr. Jahangiri was told that his tenure with LewisGale had ended. Ex. 9, at RFA Admission 33.

**LewisGale knew it was in possession of a fully executed contract with Dr. Jahangiri for his third year when it terminated Dr. Jahangiri's employment.**

44. Dr. Jahangiri's executed third-year contract ("Y3 Contract") is Ex. 44.

45. Dr. Ellsworth provided resident contract templates to Kathy Cole, who worked in LewisGale's C-Suite. Ex. 3, Ellsworth, at 22-23. LewisGale's CEO signed the contracts, and Cole sent the signed contracts to the departmental coordinators who sent them out. Ex. 12, Martin, at 21; Ex. 3, Ellsworth, at 23; Ex. 2, Rule 30(b)(6), Griffin, at 7:18-24. Zac Martin was the coordinator for internal medicine, and his job was to receive the signed contracts from Cole, notify the residents that the contracts were ready, distribute the contracts, collect the executed contracts,

and return them to Cole. Ex. 3, Ellsworth, at 23; Ex. 12, Martin, at 21, 24-25.

46. Upon receipt of Dr. Jahangiri's contract, Martin confirmed with Dr. Ellsworth that Dr. Jahangiri should receive his Y3 Contract; Dr. Ellsworth told him to "go ahead and hand the contract out." Ex. 12, Martin, at 28.

47. On June 4, 2020, Martin texted Dr. Jahangiri that his Y3 contract was ready. Ex. 34.

48. Dr. Jahangiri signed the contract on June 11, 2020. Ex. 44.

49. Dr. Griffin and Dr. Ellsworth knew by at least June 12, 2020, that Dr. Jahangiri had received his Y3 Contract, signed by LewisGale's CEO. Ex. 3, Ellsworth, at 24-25; Ex. 2, Rule 30(b)(6), Griffin, at 117:3-10.

50. On June 15, 2020, at 4:47 a.m., Dr. Jahangiri returned his fully executed Y3 contract to LewisGale, sliding it under Martin's door. Ex. 9, RFA 32; Ex. 12, Martin, at 28-29; Ex. 1, Jahangiri, at 335. Martin was "an appropriate representative to receive an executed copy of a resident's Graduate Medical Education Resident Contract." Ex. 9, RFA 30; Ex. 2, Rule 30(b)(6), Griffin, at 13:10-14.

51. When Martin arrived at work around 7am on June 15, 2020, he found Dr. Jahangiri's fully executed Y3 Contract and notified Dr. Ellsworth. Ex. 12, Martin, at 26-29; Ex. 3, Ellsworth, at 70.

52. Three hours after Dr. Jahangiri had returned the fully executed Y3 contract, and after Dr. Ellsworth knew that the contract had been returned, Ex. 9, RFA 31, Dr. Jahangiri was terminated from employment and given a "non-renewal" letter, which stated in pertinent part:

> Some time ago, a hospital employee created the batch of renewal contracts for all current residents. They were sent to each current resident. Yours was sent in error as your final evaluations for the year were not complete and there remained significant concerns as to your performance.

Ex. 35.

53. According to Dr. Griffin, Dr. Ellsworth authored the nonrenewal letter, dated June 15,

2020, and told Dr. Griffith to sign it. Ex. 7, Griffin, at 135. Dr. Griffin printed and signed it at 7:55am on June 15, 2020, minutes prior to his meeting with Dr. Jahangiri, three hours after Dr. Jahangiri returned the signed contract to Martin's office, and after Dr. Ellsworth and Martin were aware that LewisGale was in possession of a fully executed Y3 Contract for Dr. Jahangiri. Ex. 7, Griffin, at 140-41; Ex. 9, RFA 31-33.

54. On June 15, 2020, LewisGale had possession of a fully executed contract which stated that Dr. Jahangiri could not be terminated without cause. Ex. 9, RFA 34. LewisGale never notified Dr. Jahangiri that it was terminating his Y3 Contract for cause. Ex. 9, RFA 35.

### Standard of Review

The Court must view the evidence in the light most favorable to the non-moving party to determine whether material questions of fact exist. *Reeves v. Sanders Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

### Legal Analysis

### A. Questions of fact remain as to whether Lewis-Gale breached its contracts with Dr. Jahangiri.

To establish breach of contract under Virginia common law, a plaintiff must demonstrate "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (2004) (citations omitted). The elements of a contract are offer, acceptance, consideration. 4A M.J. CONTRACTS § 2 (2022).

### 1. Y2: A jury must determine whether 15 days is sufficient notice, especially as it was far too late for Dr. Jahangiri to transition into another program for the upcoming year.

The Y2 Contract requires as much notice as circumstances reasonably allow. Ex. 42. LewisGale only gave Dr. Jahangiri 15-days' notice. Ex. 9, at RFA Admission 33.

Dr. Griffin testified that to support his decision, he was sent a "packet of documents" from things that "[Haney and Lindsey] saved," Ex. 7, Griffin, at 53-54. Questions of fact remain as to whether a packet of "saved" items can be pulled out to give only 15 days' notice, especially when it is known that notice needs to be given much earlier in the year for the employee to be considered for admission into another employment program for the upcoming year. *See, e.g.*, Ex. 12, at 11:13-25 and 12:1-5; Ex. 7, at 19:15-25, 20:6-15. In fact, if Dr. Jahangiri had wanted to terminate his Y2 contract, he had to provide 90 days' notice (Ex. 52, ¶4). A jury must weigh the evidence and determine whether 15 days was as much notice as the circumstances reasonably allowed.

### 2. Y3: There is no doubt that the claim must be determined by a jury.

#### i. The Y3 contract was valid and enforceable when LewisGale exercised its option to renew the Y2 contract under the terms of the Y2 contract.

The Y2 contract was renewable at LewisGale's sole option. "Hospital is not obligated to renew or extend this Agreement for subsequent training levels." Y2 Contract 3(D); *see also* Ex. 7, Griffin, at 56:23-24. A renewal or extension of the Y2 contract "for subsequent training levels" is the Y3 contract for the third year of residency. Dr. Griffin himself described the Y3 contract as the "renewal contract." Ex. 2, Rule 30(b)(6), Griffin, at 80:17; Ex. 35. Martin understood the Y3 contract to be the result of a decision to renew under the Y2 contract. "[W]hen the [Y3] contracts were handed out, I immediately took Wali's because I knew that there was a question about whether it was . . . it should be handed out or not." Ex. 12, Martin, at 28:7-10.

LewisGale's right to offer or decline to "extend [the Y2 contract] for subsequent training levels" was in the nature of a contractual option. Unless the contractual terms state otherwise, an option may be exercised during the term of the existing contract. *See Great Atl. & Pac. Tea Co. v. Cofer*, 129 Va. 640, 664, 106 S.E. 695, 703 (1921). Once exercised, an option becomes a binding contract. *Watkins v. Robertson*, 105 Va. 269, 284, 54 S.E. 33, 38 (1906). *Accord Hart v. Hart*, 35

16

Va. App. 221, 236, 544 S.E.2d 366, 373 (2001) (citing Am. Jur. 2d Vendor and Purchaser § 56 (2000) (for contracts of sale)); *Wilburn v. Mangano*, 299 Va. 348, 353, 851 S.E.2d 474, 476 (2020).

Y3 has all elements of a binding contract. A standard method of making an offer is to submit to the offeree a written agreement signed by the offeror and to invite the offeree to sign. *See* § 27; Restatement Contracts Section 26 comments. Dr. Jahangiri received the contract from Martin, signed by LewisGale's CEO, and signed and accepted it. *Green's Ex'rs v. Smith*, 146 Va. 442, 453, 131 S.E. 846, 849 (1926) ("A contract may be formed by accepting a paper containing terms"). The agreement did not lack consideration: LewisGale agreed to pay Dr. Jahangiri, and Dr. Jahangiri agreed to work for LewisGale for the year, with a requirement that he provide 90 days' notice if he wished to no longer continue employment with LewisGale.

### ii. The Y3 contract was binding, and LewisGale could not render it "[in]effective[]" by declaring, after exercising its option to renew the Y2 contract, that it was now declining to renew.

LewisGale argues that it retained the ability to decline to renew the Y2 contract through the end of that contractual term, June 30, 2020, even after the Y3 contract was offered and accepted. LewisGale maintains that its June 15, 2020, notice of nonrenewal "negated any potential effectiveness of the Y3 contract." According to LewisGale, this right of never-fully-exercised-option is assumed in the Y2 contract and can be defeated only by a clear statement to the contrary in either the GME Resident manual or the Y2 contract. This argument does not comport with the plain language of the contract, the understanding of the parties, or basic principles of contract law.

LewisGale exercised its one-time right to decide whether to renew when it issued a signed Y3 contract to Dr. Jahangiri, and the Y3 contract became a binding contract when Dr. Jahangiri accepted and signed it. The June 15 "nonrenewal" came too late. LewisGale could not defeat the binding contract and "[i]t can make no difference that the defendant has tried to withdraw the

option." *Watkins*, 105 Va. at 284, 54 S.E. at 38. Dr. Ellsworth understood that once the Y3 contract

had been offered to Dr. Jahangiri, LewisGale had exercised its option to renew. Dr. Ellsworth tried

"to get [Martin] to get [the Y3 contract] back unsigned, but" as Martin put it, "[the] barn door is

open. Horse is long gone…I couldn't shut the barn door. I already put the contract in Wali's hand.

He was going to sign it." Ex. 12, Martin, at 30:21-31:2; *see also* Ex. 3, Ellsworth, at 24:21-25 ("I

literally ran down the hall, asked [Martin] if Dr. Jahangiri had returned his contract.").

### iii. The Y3 Contract is not unenforceable simply because the term of Y3 had not yet begun.

LewisGale argues that Dr. Jahangiri's signing of the Y3 contract on June 11, 2020, was

ineffective because the Y2 contract was in effect until June 30. As explained *supra*, the Y3 contract

was the result of LewisGale's exercise of the option provided to it in the Y2 contract. Under general

principles of contract law, the exercise of an option produces a second binding contract. *See supra*.

Thus, when Dr. Jahangiri signed the Y3 contract, LewisGale became obligated on both contracts.

LewisGale argues that the Y3 contract was unenforceable prior to July 1, 2020, due to lack

of consideration as the parties could not perform their contractual obligations until that date. The

fact that the term had not yet begun says nothing about whether the contract lacked consideration.

If that was the case, every contract signed between parties dictating future acts could be repudiated

without consequence. Instead, LewisGale's clear, unequivocal statement of its intent not to

perform was an anticipatory breach, and after July 1, 2020 when LewisGale followed through on

its repudiation, its breach no longer was anticipatory. 4A M.J. CONTRACTS § 76 (2022); *see

Vahabzadeh v. Mooney*, 241 Va. 47, 399 S.E.2d 803 (1991) (a clear, unequivocal repudiation of a

contract is a breach of contract). When LewisGale refused to allow Dr. Jahangiri to return for this

third year of residency, it breached the Y3 contract, and Dr. Jahangiri suffered damages and lost

substantial income.

### iv. LewisGale did not terminate the Y3 contract for cause.

LewisGale now claims it did not breach Y3 but terminated it for cause. Yet, in discovery,

LewisGale admitted that it never notified Dr. Jahangiri that it terminated Y3 for cause. Ex. 9, RFA

35. LewisGale officials consistently testified that they did not terminate Dr. Jahangiri's [Y3]

contract, but that they declined to renew his Y2 contract.

> Q      Now, at some point, Dr. Jahangiri was let go from the residency program at
> LGMC, right? . . .
> A      Wrong. His contract was not renewed.
> Q      So it is your position that you did not go through a termination of contract
> with him?
> A      That's correct.

Ex. 7, Griffin, at 52:11-17.

> I can tell you that Dr. Jahangiri was notified that . . . his contract would not be
> renewed. . . . I upheld Dr. Griffin's decision to not renew his contract. . . . I made
> the decision to not renew his contract.

Ex. 3, Ellsworth, at 70:21-23, 71:5-6, 73:7-8.

> Q      After he was terminated from employment?
> A      After he was notified that he would not be renewed . . . .

Ex. 3, Ellsworth, at 77:2-6. LewisGale's new assertion that it terminated Y3 for cause is a direct

contradiction of its position throughout this litigation. Ex. 9, at RFA 35.

Moreover, there was no cause to terminate the contract, which is discussed further herein.

### B. Dr. Jahangiri has laid out a prima facie case for discrimination under Title VII on the basis of race, national origin, and religion. Questions of fact remain as to pretext.

To establish a prima facie case of discrimination, a plaintiff must show: (1) membership in

a protected class; (2) adverse employment action; and (3) causal connection. *Bryant v. Bell Atl.

Md. Inc*., 288 F.3d 124, 133 (4th Cir. 2002). After the prima facie case is established, the burden

shifts to the employer to rebut the plaintiff's inference of discrimination by producing evidence

showing that it had a nondiscriminatory reason for the adverse employment action, and then the plaintiff must prove, at trial, by preponderance of the evidence that the employer's proffered reason was a pretext for discrimination. *Merritt v. Old Dominion Freight Line, Inc*., 601 F.3d 289, 294 (4th Cir. 2010). At summary judgment, the question is whether there are disputed facts regarding these elements for a jury to resolve.

Defendant does not contest the first or second elements but argues that "Plaintiff cannot prove he engaged in satisfactory performance and, he cannot prove that similarly situated comparators were treated more favorably." The evidence shows, however, that while Dr. Jahangiri was not at the top of his group, Dr. Jahangiri improved steadily, and by January 2020, the CCC was pleased with his performance. When the CCC met on June 3, 2020 to determine whether to offer the residents contracts for the coming year, the CCC determined that Dr. Jahangiri should receive a contract. The only thing that changed that decision was Dr. Griffin's back-channel arrangement with Dr. Haney for another "evaluation" which he would use to override the CCC's decision. The evidence suggests that a jury may determine this was a set-up. Specifically, in May 2020, Dr. Griffin returned Dr. Jahangiri to Dr. Haney's team "to see how he handles stress." Ex. 29. On May 11, 2020, Dr. Griffin emailed Dr. Haney with the following request: "I would appreciate your evaluation of him given the difficulty he had the last time he was on your team." Ex. 30. Dr. Griffin even teed-up the substance of the negative review that he was hoping for: "I talked with him last week along these lines and that he be well-prepared for rounds every day, both as a supervising resident and team leader." Ex. 30. In response, Dr. Haney fired off some short notes to Dr. Griffin on the morning of May 14, 2020, alleging that Dr. Jahangiri had not completed his "pre rounds" and his "notes," and "reaction [sic] when confronted with questions." Ex. 28. When Dr. Jahangiri appealed his dismissal on June 18, 2020, Dr. Griffin fired off a text message

to Dr. Haney: "I need your observations on Wali in writing, detailed, as soon as possible. Rec[ei]ved his anticipated appeal today. Program has 10 days to respond." Ex. 47.

Further, Dr. Jahangiri's alleged interpersonal difficulties were not unique. Other non-minority residents such as Drs. Lindsey and Karo were evaluated as abrasive or difficult, yet they were not remediated, and in Dr. Karo's case, not even counseled. *Infra*. In fact, in June 2020, numerous residents had negative feedback, yet they were not terminated (Ex. 54, at LGMC-WJ 2177-2184: "My observation is that Tommy has, at the very least failed to progress and has possibly regressed since the last 6 months evaluation"; 2200-2203: "Dr. Malik has shown stagnation in her development here in the clinic. … [h]er medical reasoning and medical knowledge are perceived to be below the level of her peers.."; 2219-2222, "[t]he past 6 months have been challenging in regard to communication with Ameen. I have had to deliver clinic policy which hasn't been well received by Ameen resulting in unnecessary conflict."; 2228-2231, "Working with Dr Ashraf by far was the biggest challenge I faced during my first 6 months of residency. The majority of time was spent debating who did this and who did that instead of focusing on patient care.  She called me a liar once in front of team members and a medical student…"; 2236-2240, "The language barrier for euphemisms, sarcasm, metaphor, and puns can lead to confusion and perceptions of disagreement. Not sure how to work on that except increased exposure to American culture and colloquial peech").[2] Similarly, the alleged issue regarding patients complaining is also not unique. E.g., Ex. 46 (Line 15182: resident fired by patient; Lines 23921-927: patient does not want resident there).

---

[2] In addition, to the extent that LewisGale is claiming that the patient complaint to the Board had anything to do with Dr. Jahangiri's termination, this is disingenuous given that Dr. Junko was the physician named in the complaint, Dr. Junko would have made the diagnosis that the patient was upset about, and Dr. Junko was not disciplined for the Board complaint. Ex. 55.

Moreover, while LewisGale claims Dr. Jahangiri was unprofessional, the record demonstrates the opposite, and during the 6 months leading up the termination of Dr. Jahangiri's employment, Dr. Jahangiri was positively rated. To the contrary, Dr. Haney made and received highly inappropriate remarks about patients from residents *other than Dr. Jahangiri* (Ex. 46, Line 3: "wow. The toes are legitimately black with chunks falling off. They smell too."; Line 1151: "He has tumors everywhere!!"; Line 1436: patient called Dopesick; Line 2686: patient called uni-bomber; Line 15150: glad did not see patient because had bed bugs; Lines 15244-45: resident jokes about giving a patient marijuana; Lines 18508-14: patient "is a real ass"; Line 20708: patient "covered in piss and maybe feces down to her scds and drooling"; Line 20883: doctor "won't look at [patient's] vag. She has a dry old lady one"; Lines 22671-685: comments about a nonverbal patient trying to swallow telemetry leads, "yum", "so tasty," "Haha! I bet they taste sticky").

Plaintiff, thus, has laid out a prima facie case of disparate treatment and questions of fact remain as to pretext.

Finally, *Proud v. Stone* is not applicable to this case. Dr. Arsura was the PD who interviewed Dr. Jahangiri. Ex. 1, Jahangiri, at 27:7-11. Dr. Griffin later became the PD, but he did not interview Dr. Jahangiri. Ex. 7, Griffin, at 17:10-11. DIOs make termination decisions, Ex. 3, Ellsworth, at 12:13-20, and Dr. Ellsworth was the DIO at the time of the termination of Dr. Jahangiri's employment Ex. 3, Ellsworth, at 12:18-23. Thus, there is no same actor in this case. *Davis v. Town of Tazewell*, No. 1:18CV00030, 2019 U.S. Dist. LEXIS 184676, at \*17 (W.D. Va. Oct. 25, 2019) (not applying *Proud* inference when the person who fired Plaintiff might have only communicated a three-person committee's decision to hire Plaintiff); *Larry v. Marion Cty. Coal Co.*, 302 F. Supp. 3d 763, 773 (N.D.W. Va. 2018) (citing *Burgess v. Bowen*, 466 Fed.Appx. 272, 280 n. 4 (4th Cir. 2012) (same actor inference is not appropriate where a factual dispute exists over

who made the termination decision); *Constellium*, 2017 U.S. Dist. LEXIS 64779, 2017 WL 1552325, at \*10 (S.D.W. Va. Apr. 28, 2017) (same)).

### C. Dr. Jahangiri has laid out a prima facie case for retaliation under Title VII. Questions of fact remain as to pretext.

The Fourth Circuit has established a three-part test for evaluating retaliation claims: (1) Plaintiff engaged in protected activity; (2) Plaintiff suffered an adverse employment action; and (3) there is a causal link between the two. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015). Defendant disputes the first and the third elements.

Defendant claims that "[i]n October 2019, Plaintiff and his attorney appealed Plaintiff's suspension and discussed [the] suspension with Dr. Ellsworth in a meeting at Panera but neither Plaintiff nor his attorney mentioned race, national origin and/or religious discrimination *during this meeting*." MSJ p. 22 [Emphasis added]. This is disingenuous. By October 2019, Dr. Ellsworth had the letter from Mr. Beers stating that "[Dr. Jahangiri's] suspension is based on impermissible stereotypes concerning persons of Pakistani heritage, national origin or ethnicity who adhere to the Islamic faith." Ex. 18. This is protected activity. Dr. Jahangiri also engaged in protected activity when he asked Dr. Griffin in May 2020 to remove him from Dr. Haney's supervision because she was unable to make fair evaluations of him as she was still claiming she was afraid of Dr. Jahangiri despite the discriminatory bombing accusation being disproven. Ex. 37, ¶ 11.

Defendant also alleges that Plaintiff cannot establish a causal link between his allegation of discrimination and his dismissal. But that is also not the case. Dr. Ellsworth reported to Dr. Jahangiri that Dr. Griffin wanted him gone in September 2019 at the time of his protected report. Ex. 1, Jahangiri, at 281:9-10. Dr. Griffin also told the police that the hospital was going to pursue termination of Dr. Jahangiri. Ex. 41, at 810. Dr. Ellsworth told Dr. Brian King that "[i]f it were up to me, I would fire him." Ex. 48, ¶14. It seems that the only thing that kept Dr. Griffin and

Dr. Ellsworth from following through in September was that "HCA's attorneys have gotten involved with the decision of the disciplinary board…[and] [a]t this time JAHANGIRI would be allowed to return to HCA as an employee." Ex. 41, at 811.

Dr. Griffin, however, did not give up. He put Dr. Jahangiri on official remediation as soon as he returned, and this time he involved the CCC. When the CCC was satisfied with Dr. Jahangiri's progress and determined to promote him, Dr. Griffin placed Dr. Jahangiri on another rotation with Dr. Haney, a reliable negative reviewer, and asked for her feedback. When the CCC approved sending a Y3 contract to Dr. Jahangiri on June 3, 2020, Dr. Griffin reached out to Dr. Haney again and new allegations of incompetence and untruthfulness materialized. Finally, armed with Dr. Haney's latest evaluation, Dr. Griffin and Dr. Ellsworth overruled the decision of the CCC, and terminated Dr. Jahangiri's employment. The time-lag between September 30, 2019, and June 15, 2020, was longer than Drs. Ellsworth and Griffin wanted it to be, but this makes sense given the efforts Drs. Ellsworth and Griffin had to go through to override both legal and the CCC. The evidence between January-July 2020 is that Dr. Jahangiri was performing well, Ex. 37, ¶10; Ex. 33. The evidence is that Dr. Jahangiri was performing in line with other residents. *Infra*. There was no cause to terminate. The CCC would have terminated Dr. Jahangiri's employment if so. "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision" *Ham v. Washington Suburban Sanitary Comm'n*, 158 F. App'x 457, 463 (4th Cir. 2005) (citation omitted); *Mesnick v. General Elec. Co.,* 950 F.2d 816, 824 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992) ("Because the resultant burden can be carried without direct proof of discrimination, requiring the plaintiff to show that the employer's reason is a pretext…comports with the principle that a plaintiff should not be required to produce 'smoking-

gun' evidence before prevailing in a discrimination suit. There are many veins of circumstantial evidence that may be mined by a plaintiff to this end."); *Presley v. Beaufort Cty. Sch. Dist.*, 2020 WL 9216305, at *14 (D.S.C. July 9, 2020), report and recommendation adopted, 2021 WL 791206 (D.S.C. Mar. 2, 2021) (citing *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 727 (4th Cir. 2019) ("The Fourth Circuit recently reiterated that the so-called 'pretext-plus' standard employed before the *Reeves* decision had been abrogated. An employee may show pretext by undercutting his employer's justification for termination or other adverse action. The employee is not also required to introduce evidence that shows a 'specific and discriminatory motive.'").

### D. Dr. Jahangiri has set out a prima facie case for a hostile work environment under Title VII.

To prevail on a hostile work environment claim, a plaintiff must show that there is (1) unwelcome conduct; (2) based on plaintiff's protected characteristics; (3) which is sufficiently severe *or* pervasive to alter the plaintiff's conditions of employment; and (4) which is imputable to the employer. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016). Defendant contends that Plaintiff can prove none of these elements.

However, it was only on account of Dr. Jahangiri's race, national origin, and religion, that he was labeled a terrorist and reported to the police. Following this false accusation, Dr. Jahangiri was treated as a terrorist by his coworkers, who made machine gun sounds and reported to senior management that they were looking for bulletproof protection and claimed to fear Dr. Jahangiri. Other courts have found this type of situation to be "sufficiently severe" to state a hostile work environment claim. "Harassment, abusive conduct–such as name calling, profane language, racial discrimination, and unjustified public ridicule–or unjust accusations of criminal conduct or dishonesty, without an opportunity to respond, creates a hostile work environment." *Cumberledge v. Unemployment Comp. Bd. of Rev.*, No. 2012 CD 2020 (Comm. Ct. Penn. Mar. 2, 2021).

## Conclusion

For the foregoing reasons, the Court should deny Defendant's Motion for Summary

Judgment

Respectfully submitted,

WALI JAHANGIRI, M.D.

*/s/ Brittany M. Haddox*
Brittany M. Haddox, Esq. (VSB # 86416)
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
Monica L. Mroz, Esq. (VSB #65766)
STRELKA EMPLOYMENT LAW
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA  24011
Tel:  540-283-0802
brittany@strelkalaw.com
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of August, 2022, I electronically filed this pleading on

the Court's CM/ECF filing system which contemporaneously sent a Notice of Electronic Filing to

all counsel of record.

*/s/ Brittany M. Haddox*