UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **WALI JAHANGIRI,** | ) | |
| **Plaintiff.** | ) | |
| **v.** | ) | **Civil No.: 7:21-cv-0427** |
| | ) | |
| **LEWISGALE MEDICAL CENTER,** | ) | **By: Michael F. Urbanski** |
| **LLC,** | ) | **Chief United States** |
| **Defendant.** | ) | **District Judge** |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Wali Jahangiri brought a complaint against Defendant LewisGale Medical Center, LLC ("LG"), containing six claims: Count I—Title VII Race Discrimination, Count II—Title VII National Origin Discrimination, Count III—Title VII Religious Discrimination, Count IV—Title VII Hostile Work Environment, Count V—Title VII Retaliation, and Count VI—Breach of Contract. As explained herein, considering the evidence in the light most favorable to Jahangiri, no reasonable jury could conclude that Jahangiri was subjected to unlawful race, national origin, or religious discrimination. Nor do the facts of this case support his claim for breach of contract. As a result, LG's motion for summary judgment, ECF No. 44, will be **GRANTED** and the case dismissed with prejudice.[1]

### I.   Factual Background

Dr. Jahangiri is a South Asian, Muslim male born in Abbottabad, Pakistan. ECF No. 48 at 1. He began to work for LG in July 2018 as an internal medicine resident. Jahangiri's

---

[1] Defendant's pending motion to exclude expert testimony, ECF No. 39, is **DENIED as Moot**.

residency program class at LG included ten other Pakistani residents, all of whom successfully completed the program in 2021. Decl. of Dr. Edward Griffin, ECF No. 45-4, ¶ 5.

The LG residency program, its contracts, and its residents, are governed by the policies and procedures outlined in the GME Resident & Fellow Manual ("GME Resident Manual"). See GME Resident Manual 2019-2020, ECF No. 48-43. The GME Resident Manual outlines a number of key positions involved in the management of a residency program, including a Program Director,[2] Designated Institutional Official,[3] and Clinical Competency Committee.[4]

The three-year residency program is governed by a series of one-year contracts, each with a start date of July 1 and an end date of June 30.[5] The reappointment and promotion provision of each Resident Contract provides as follows:

> D. **Conditions for reappointment and promotion.** Hospital provides continuation and/or promotion of the Resident that is contingent upon satisfactory academic and professional performance by the Resident as determined by the Program Director and faculty, and in accordance with policies and procedures described in the GME Resident Manual. Achievement of competency based goals and objectives for each level of training will be used as one measure of performance and promotion, but not the only criteria of performance. Hospital is

---

[2] The GME Resident Manual describes the role of the Program Director as follows: "The program director (PD) is the one physician designated with authority and accountability for the operation of the residency/fellowship program." GME Resident Manual 2019-2020, ECF No. 48-43, at 5. Dr. Edward A. Griffin was the Program Director at LG during Jahangiri's residency.

[3] The GME Resident Manual describes the role of the Designated Institutional Official as follows: "The designated institutional official (DIO) is the individual in a sponsoring institution who has the authority and responsibility for all of the ACGME-accredited programs." GME Resident Manual 2019-2020, ECF No. 48-43, at 4.  ACGME is the Accreditation Council for Graduate Medical Education. Dr. Sterling Ellsworth was the DIO at LG during Jahangiri's residency.

[4] The GME Resident Manual describes the role of the Clinical Competency Committee as follows: "The clinical competency committee (CCC) is a required body comprising three or more members of the active teaching faculty who is advisory to the program director and reviews the progress of all residents and fellows in the program." GME Resident Manual 2019-2020, ECF No. 48-43, at 4.

[5] The 2019-2020 Second Year Resident Contract signed by LG and Jahangiri is docketed at ECF Nos. 45-13 and 48-42. The 2020-2021 Third Year Resident Contract signed by LG and Jahangiri is docketed at ECF No. 45-31.

> not obligated to renew or extend this Agreement for subsequent
> training levels in the event that the academic and professional
> performance by the Resident is determined to be unsatisfactory,
> subject to the provisions of due process set forth in the GME
> Resident Manual. Hospital shall provide notice to the Resident
> prior to the End Date of this Agreement regarding promotion to
> the next year of training or graduation from the Program. If the
> Resident will not be promoted, the Program shall endeavor to
> provide as much notice as circumstances reasonably allow, prior
> to the end of this Agreement. Disputes that arise from the
> promotion or graduation decision may be directed through the
> grievance and due process procedure in accordance with the
> GME Resident Manual.

2019-2010 Second Year Resident Contract, ECF No. 48-42, at 3.

Residents who experience difficulties meeting the required competencies[6] may be placed on a remediation plan by LG, as outlined in the GME Resident Manual. GME Resident Manual 2019-2020, ECF No. 48-43, at 21-22. According to the GME Resident Manual, residents "may undergo remediation, which allows for a correction of deficiencies that require intervention." Id. at 21.

By September 2018, a few months after the start of Jahangiri's residency, the Program Director, Dr. Edward A. Griffin, "began to receive reports that Plaintiff had exhibited unprofessional, angry, and rude behavior towards patients, staff, and faculty at LewisGale. In fact, some patients requested that Plaintiff be removed from their care." Griffin Decl., ECF No. 45-4, ¶ 10. Jahangiri was placed in a remediation plan. See Griffin Sept. 6, 2018, Memorandum, ECF No. 45-4, at 10-11; Jahangiri First Remediation Plan, ECF No. 48-23. In

---

[6] The GME Resident Manual defines Competencies as follows: "Competencies are specific knowledge, skills, behaviors and attitudes, and the appropriate educational experiences required of residents and fellows to complete GME programs. These include patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism and systems-based practice. GME Resident Manual 2019-2020, ECF No. 48-43, at 4.

December 2018, Griffin met with Jahangiri and reviewed his written evaluations, which revealed continuing problems. See Memoranda Regarding Jahangiri Remediation Status, ECF No. 45-4, at 13-16.

On May 13, 2019, Jahangiri signed the 2019-2020 Second Year Resident Contract, ECF No. 48-42. As reflected in a June 17, 2019, memorandum authored by Griffin entitled Updated Remediation Plan, problems persisted:

> I met with Dr. Jahangiri this morning to go over his most recent evaluation by Dr. Jennifer Haynie. I informed him that:
>
> 1. Despite his objection, the evaluation establishes a lack of veracity (truthfulness) on his part. This interferes with working with patients, fellow house officers, and other hospital staff.
> 2. He is completely unprepared for rounds, which further complicates patient care and working in a health care team.
> 3. He is continually late for rounds.
> 4. His work and documentation is inefficient and disorganized.
>
> Given these deficiencies, which reflect a significant deterioration from his previous evaluations:
>
> 1. He will not promote to PGY 2 level but will work on the ward teams as an intern, with close supervision by his upper level resident. The resident and the attending will advance his responsibilities at their discretion.
> 2. Further episodes of less-than-full truthfulness in dealing with fellow residents, staff and patients will lead to dismissal from the program.
> 3. While there is no timetable for promotion, the minimum time needed is at the discretion of the program director. Failure to promote to PGY2 level by December 31, 2019 will result in termination.

Griffin June 17, 2019, Memorandum, ECF No. 45-4, at 18. Jahangiri was copied on the memorandum. Griffin's memorandum dated June 20, 2019, signed by Jahangiri, summarized the plan going forward:

4

> I have met with Dr. Jahangiri and outlined his deficiencies in detail. As a result, the following plan is implemented:
>
> 1.) He will be on wards next week for one week. He must be fully prepared for rounds, able to present and discuss his patients effectively and truthfully. He must be on time for rounds and remain with the team on rounds for the entire time, unless emergent problems require his attention.
> 2.) If there are any lapses or occurrences that are in violation of #1 above, he will be dismissed from the program.
> 3.) If he carries out his responsibilities fully as noted #1, he will remain in the program, continuing and participating fully in his remediation plan, but at a PGY 1 level, as his performance is such that he is unable to assume responsibilities of a second year resident at the present time. He will evaluated on regular intervals as his formative milestone evaluation come in.

Griffin June 20, 2019, Memorandum, ECF No. 45-4, at 19. In September 2019, a patient complained about Jahangiri, requiring additional counseling by Griffin. See ECF No. 45-4, at 20-22.

Jahangiri offers no evidence that derogatory remarks regarding his race, national origin, or religion were made to him by anyone at LG. Jahangiri Dep., ECF No. 48-1, at 134-135. Nonetheless, Jahangiri believes that the teaching hospitalist leading the clinical team to which he was assigned, Dr. Jennifer Haney, discriminated against him in her handling of his clinical evaluations and in suggesting that he was not truthful about completing patient rounds. Id. at 131.[7] Tension arose between Jahangiri and Haney over Jahangiri's perceived attitude towards women. In particular, Jahangiri took offense at Haney stereotyping him by stating "[w]hat does Wali expect… for women to cook and clean for him?" Jahangiri Dep., ECF No. 48-1, at 118.

---

[7] While Jahangiri focuses his discrimination claim against Haney, Griffin, and Ellsworth, he also testified at deposition that Dr. Gretchen Junko's clinical evaluations were discriminatory, Jahangiri Dep., ECF No. 48-1, at 158-160, and that Dr. Kevin Coppedge's criticism of him following an emergency room nursing issue was discriminatory. Id. at 246-251.

In large part, Jahangiri's discrimination claim centers around an episode which occurred in September 2019. At that time, comments were exchanged between Jahangiri and ICU nurse Helena Tilley which resulted in Jahangiri's brief suspension. While Jahangiri disputes the full extent of Tilley's account of the exchange, Jahangiri admitted at deposition that he stated aloud in the ICU "I want to die." Jahangiri Dep., ECF No. 48-1, at 270. Jahangiri testified that Tilley responded by asking him "You're not going to shoot up the ICU, are you?" Id.  Viewing Tilley's question as inappropriate banter, Jahangiri testified that he responded to Tilley "Yeah, sure, whatever." Id. In the ensuing days, Program Director Griffin called Jahangiri to his office and reported that "[p]eople are saying that you are going to shoot up the hospital." Id. at 272. Jahangiri testified that he asked to call his mother and thereafter declined to comment further, testifying that "I only told them I wanted to talk to my lawyer." Id. at 275. At that point, Jahangiri was escorted from the hospital.[8] LG's Designated Institutional Official, Dr. Sterling Ellsworth, wrote Jahangiri on September 23, 2019, notifying him that he was "immediately suspended pending further investigation of alleged comments recently made at LewisGale Medical Center." Ellsworth Sept. 23, 2019, Letter, ECF No. 48-14. Jahangiri retained counsel and challenged the suspension, asserting that it was "based on impermissible stereotypes concerning persons of Pakistani heritage, national origin, or ethnicity who adhere to the Islamic faith." Paul G. Beers, Esq., Sept. 30, 2019, Letter, ECF No. 48-18. Ellsworth testified

---

[8] Jahangiri places great significance on statements made by a LG security officer, Derek Wheeler, to the Salem Police Department that he was unnerved because Jahangiri was Pakistani and "potentially could have ties to areas that currently have terroristic activities."  Wheeler Dep., ECF No. 48-6, at 22-23. While these comments by a hospital security officer arguably betray the security officer's national origin bias, they are immaterial to this case as there is no suggestion that Wheeler made any such comments to Jahangiri or that he had any role whatsoever in the nonrenewal of the 2020-2021 Third Year Resident Contract or termination of Jahangiri's employment with LG.

that he investigated the incident, Ellsworth Dep., ECF No. 48-3, at 29-44, and lifted the suspension by letter dated October 4, 2019. Ellsworth Oct. 4, 2019, Letter, ECF No. 45-21.

After returning to work following the suspension, Jahangiri said he was subjected to ongoing discrimination as follows:

> Because LewisGale labeled me a terrorist, other staff members, particulary Caucasian females, began voicing a fear of me. Dr. Ellsworth informed my attorney that the nurses in the ICU were awaiting my return wearing bullet-proof vests. One employee made a comment involving an "Uzi" and another made sounds imitating the firing of a submachine gun. It was humiliating.

Jahangiri Decl., ECF No. 48-37, ¶ 15.

On November 11, 2019, Jahangiri was placed on another remediation plan, this time with an expected duration of twelve weeks, because he "failed to achieve satisfactory performance in multiple ACGME competencies." November 2019 Remediation Plan, ECF No. 45-25, at 1. Jahangiri successfully completed this period of remediation, as reflected in Griffin's written Summary of Remediation provided to the Clinical Competency Committee ("CCC") on January 29, 2020:

> Summary: Dr. Jahangiri has met all the requirements of his remediation and it is the opinion of the committee and the Program Director that his remediation be concluded and he be promoted to the PGY 2 level. His initial ward rotation will be on a team where he will be the second PGY2 to limit his supervisory responsibilities for the first month. Any further adjustments to his responsibilities will depend on his performance in his initial rotations. The committee will meet in a special called session to review his progress in April.

Griffin January 29, 2020, Summary of Remediation, ECF No. 45-28, at 2. Griffin testified that at this point Jahangiri was about seven months behind the original residency progression schedule. Griffin Dep., ECF No. 48-7, at 133.

On June 3, 2020, the CCC met and decided to issue Third Year Resident Contracts to all second year residents, including Jahangiri. The notes of the CCC meeting taken by Zachary Martin, residency program coordinator, reflect ongoing concerns about Jahangiri's performance. See Martin Handwritten Notes, ECF No. 48-56, at 2. With regard to Jahangiri's 2020-2021 Third Year Resident Contract, Martin recalled at deposition the following:

> So when the contracts were handed out, I immediately took Wali's because I knew that there was a question about whether it was—it should be handed out or not. I would have asked Dr. Ellsworth if I should hand him the contract. I was told no initially. Then after some time and after additional meetings on the subject I was told to go ahead and hand that contract out.

Martin Dep., ECF No. 48-12, at 28. On June 4, 2020, Martin texted Jahangiri informing him that the 2020-2021 Third Year Resident Contract was available for pick up. Martin Text Message, ECF No. 48-34.

At some point between June 4 and June 12, 2020, Griffin met with Haney, the teaching hospitalist leading the Adult Inpatient Medicine 2 team on which Jahangiri was placed, and got "her feedback on the problems he had with her in May." Griffin Dep., ECF No. 48-7, at 61. As a result, Jahangiri was asked to meet with Griffin, Haney, and an intern, Dr. Jane Lindsay, on Friday afternoon, June 12, 2020. The meeting centered on two topics. The first topic was Jahangiri's interaction with Lindsay and a patient. Haney recalled the issue as follows:

> There was one major interaction involving a patient. I was called to a patient's room to talk with a patient. And in talking with the patient, he wanted to inform me of an interaction that he had seen between the upper level, which at that time would've been Wali, and the intern, which at that time would have been Jane Lindsay. The patient actually reported it to Risk Management at the hospital.

\*       \*       \*

8

> So the patient was saying that the intern was in the room, pre-rounding on the patient, when Dr. Jahangiri went into pre-round also on the patient. And he cut Dr. Lindsay off and started taking over the encounter with the patient and the patient actually asked him to stop. And then ultimately, asked him to leave the room.

Haney Dep., ECF No. 45-15, at 19.  The second topic was Jahangiri's truthfulness about actually seeing patients during rounds. Specifically, Jahangiri stated that he had seen a patient, which the patient denied. Haney testified that Jahangiri "said he did see her, and after the meeting, I followed up with the patient, and the patient told me that he in fact, had not seen her." Id. at 28. As a result, Griffin testified that "after I talked to Dr. Haney between the CCC Committee and June the 15th, it was apparent to me that he could not continue. If a resident cannot be truthful in his interactions, I cannot then have him finish the program." Griffin Dep., ECF No. 48-7, at 64.

Early the following Monday morning, June 15, 2020, Jahangiri returned the signed 2020-2021 Third Year Resident Contract to LG by sliding it under Martin's door shortly before 5 a.m. Martin Dep. ECF No. 48-12, at 26. After receiving Jahangiri's signed renewal contract, Martin was told by Ellsworth to put it in Jahangiri's file and do nothing further with it. Id. at 29. Later that same day, June 15, 2020, Griffin sent a letter to Jahangiri stating that the 2020-2021 Third Year Resident Contract was sent to him in error and was not being renewed. Griffin Rule 30(b)(6) Dep., ECF No. 48-2, at 113-119; Griffin June 15, 2020, Letter, ECF No. 45-32.  Jahangiri appealed the decision not to renew him for the third program year.

Jahangiri met with Ellsworth regarding Jahangiri's appeal on June 22, 2020. Ellsworth testified as follows:

> [H]e admitted to me in person that he had lied about patients'
> data and patient care under the stress of the ICU and again on
> the floor; he admitted to me—he said that he had lied; that he felt
> badly about it, but hadn't lied since. And I don't remember the
> exact day in May, three, four weeks previous to this meeting of
> mine.
>
> And that, to me, was so significant, had I known about it when it
> happened, in my mind, that would have been an event—had I
> been program director, that would have been an event to
> terminate his employment. At that point, when he admitted to
> me that he had lied and endangered patients and provided that
> kind of care, that poor care, in the midst of a nonrenewal
> decision, it was without a doubt the easiest decision, as
> unfortunate as it is—I like Dr. Jahangiri—but it absolutely made it
> easy to me; there was no other decision other than to uphold his
> nonrenewal.

Ellsworth Dep., ECF No. 48-3, at 76.

The record does not contain a direct refutation by Jahangiri of Ellsworth's assertion

that Jahangiri admitted to him on June 22, 2020, that he had been untruthful about completing

patient rounds. Jahangiri's complaint, deposition, and declaration do not directly address the

issue of what Jahangiri told Ellsworth at the June 22, 2020, appeal meeting. Nonetheless,

Jahangiri denied that he failed to conduct patient rounds when he met with Griffin, Haney,

and Lindsay on June 12, 2020. Construing the evidence in the light most favorable to Jahangiri,

the court will consider Ellsworth's assertion to be disputed by Jahangiri.

Ellsworth confirmed the denial of Jahangiri's appeal in a subsequent letter, stating as

follows:

> After a review of the facts, documents, and after speaking with
> you on June 22, 2020, I am upholding the decision to not renew
> your 2020-2021 contract. As such, your employment with
> LewisGale Medical Center will end as of June 30, 2020.

Ellsworth June 2020 Letter, ECF No. 45-34, at 1.

Throughout the depositions, pleadings, and briefing, the parties disagree as to how to characterize the events of June 2020. Jahangiri claims that he was wrongfully terminated in breach of the Second and Third Year Resident Contracts, and LG asserts that Jahangiri completed the second year residency program and was not renewed for the third year. While Jahangiri claims contract termination, LG argues contract nonrenewal. The parties' dueling constructions are ships passing in the night, and miss the reality that Jahangiri's exit from LG was both a nonrenewal of his status as a resident and a termination of his employment with LG, as clearly set forth in Ellsworth's letter denying Jahangiri's appeal.

## II.    Summary Judgment Standard

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party

must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

### III.     Counts I, II, and III: Race, National Origin and Religious Discrimination

Jahangiri's race, national origin, and religious discrimination claims cannot survive summary judgment as there is no evidence to suggest that his job performance was satisfactory or that the nonrenewal of the third year of his residency program and termination of his employment were pretextual. To state a claim of race, national origin, or religious discrimination, Jahangiri is required to show (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. See, e.g., Hughes v. Bedsole, 48 F.3d 1376, 1384 (4th Cir.1995); Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir.1993). Under the McDonnell Douglas burden-shifting framework, if Jahangiri shows the four specified elements, LG may articulate a non-discriminatory reason for the difference in treatment. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In response, Jahangiri must demonstrate that LG's stated reason was pretext used to hide discrimination. Cook, 988 F.2d at 511. Although the framework "involves a shifting back and forth of the evidentiary burden," Jahangiri "at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of Title VII." Venugopal v. Shire Laboratories, 334 F. Supp. 2d 835, 841 (D. Md. 2004); see Moore v. Mukasey, 305 F. App'x 111, 115 (4th Cir. 2008) ("Even under the McDonnell Douglas framework, however, the plaintiff bears the ultimate burden of demonstrating that the employer's actions were discriminatory.") "The crucial issue in a Title VII action is an nlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." Jiminez v. Mary Washington Coll., 57 F.3d 369, 383 (4th Cir.

1995). "National origin" refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came. Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88 (1973).

It is uncontested that Jahangiri was a member of a protected class and that LG ended the employment relationship by not renewing his residency. Jahangiri and LG disagree over his job performance and whether he was treated differently than other employees.

Jahangiri asserts that his performance was satisfactory, by referencing that he successfully completed remediation and that the CCC issued him the 2020-2021 Third Year Residency Contract on June 3, 2020. Jahangiri contends that LG reversed course because of discrimination and retaliation by Haney, Griffin, and Ellsworth. Jahangiri believes that Haney and Griffin arranged for him to receive negative evaluations, saying he was dishonest about seeing patients and completing rounds, to provide justification for his nonrenewal and termination. Jahangiri believes his nonrenewal had to be based on his race, national origin, and religion because other non-minority residents were treated differently and not subjected to counseling or remediation.

Despite Jahangiri's conclusory allegations, the evidence, timeline of events around the renewal decision, and documented success of other Pakistani residents conclusively show that no reasonable jury could conclude that Jahangiri's nonrenewal and employment termination were based on his race, national origin, or religion. From the outset of his residency program, Jahangiri struggled to meet program requirements and was placed on remediation in both his first and second years. As Ellsworth testified, Jahangiri's multiple stints of remediation were unique. "I have never in my probably 25 years of graduate medical education been aware of a

resident who spent most of their residency on remediation. Only Dr. Jahangiri." Ellsworth Dep., ECF No. 48-3, at 56. While Jahangiri completed both his first and second remediations, problems persisted. After the CCC decided on June 3, 2020, to issue Jahangiri a 2020-2021 Third Year Resident Contract, Haney told Griffin that Jahangiri had not been truthful about completing hospital rounds of patients. After meeting with Jahangiri, Haney, and Lindsay, Griffin sent the June 15, 2020, letter stating that Jahangiri's "contract would not be renewed (2019-2020 GME Resident Fellow Manual, Section XI) for the upcoming academic year (2020-2021)." Griffin June 15, 2020, Letter, ECF No. 45-32, at 1. After an appeal, Ellsworth upheld the nonrenewal of Jahangiri's 2020-2021 Third Year Resident Contract, and his employment was terminated as of June 30, 2020. Ellsworth June 2020 Letter, ECF No. 45-34, at 1.

This undisputed timeline of events establishes that once Griffin and Ellsworth learned of Haney's concern that Jahangiri was not truthful in seeing patients during hospital rounds, the decision was made not to renew the third year of his residency and terminate his employment. Although Jahangiri disputes that he was untruthful about completing patient rounds, there is nothing in the record to suggest that Griffin's and Ellsworth's rationale was discriminatory or pretextual.

Furthermore, there is no evidence that other Pakistani or foreign residents were treated less favorably or discriminatorily disciplined by LG. The record indicates that ten Pakistani doctors in Jahangiri's residency class successfully completed the LG residency program and graduated in 2021. Griffin Decl., ECF No. 45-4 at 2. While Jahangiri indicated in his deposition that Pakistani and residents from Muslim countries were disproportionately disciplined, he

15

also said he had no data to support this assertion. Jahangiri Depo., ECF No. 48-1 at 84 ("Discipline was disproportionate, I think, in its distribution, but that was just based on my observations."). Jahangiri also offers the affidavit of Dr. Brian King, a former residency classmate, who averred that "residents of South Asian de[s]cent were treated much less favorably that other residents. This was particularly true of South Asian Muslims." King Aff., ECF No. 48-48, at 1. King provided three examples of alleged disparate treatment, none involving Jahangiri. These conclusory assertions stand in stark contrast to the undisputed fact that there were ten other residents of Pakistani origin in Jahangiri's residency class who successfully completed the LG residency program in 2021. In the face of this evidence, Jahangiri's and King's conclusory assertions of disparate treatment are insufficient to raise a jury question on race, national origin, or religious discrimination.

In short, there is no evidence from which a reasonable jury could conclude that Jahangiri's performance in the residency program was satisfactory on June 15, 2020, when the decision was made not to renew him for the third year of the residency program and end his employment with LG as of June 30, 2020. Nor is there any evidence from which a jury could conclude that the reasons given for the nonrenewal and termination were discriminatory or pretextual. As a result, summary judgment is required on Jahangiri's race, national origin, and religious discrimination claims. Counts I, II, and III will be dismissed.

## IV.  Count IV: Hostile Work Environment

Jahangiri's hostile work environment claim also fails because the facts he asserts do not rise to the severe or pervasive level necessary to state a hostile work environment claim. A hostile work environment exists "when the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Boyer–Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015); Baquir v. Principi, 434 F.3d 733, 745–46 (4th Cir. 2006). Conduct is evaluated based on its "frequency…; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Boyer–Liberto, 786 F.3d at 277 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) and Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81(1998)). "[C]allous behavior by [one's] superiors," Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," Hawkins v. PepsiCo, Inc., 203 F.3d 274, 276 (4th Cir. 2000), does not rise to the level of actionable harassment. Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Viable hostile work environment claims generally involve repeated conduct because, "in contrast to discrete acts, a single act of harassment may not be actionable on its own." See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115–17 (2002).

Jahangiri's hostile work environment claim fails because the conduct of which he complains is far too isolated and sporadic to constitute a hostile work environment. Jahangiri bases his hostile work environment claim on tension with Haney about his perceived attitude towards female coworkers and fears raised by the September 2019 incident. To be sure, the events of September 2019 stemming from Jahangiri's exchange with nurse Tilley and his resulting suspension are significant, but Jahangiri returned to work in October 2019 without

any complaint of harassment for the remainder of his tenure. In short, the episodic incidents Jahangiri describes would not cause a reasonable jury to conclude that he faced severe and pervasive intimidation, ridicule, or insult characteristic of a hostile work environment.

Nor is there any suggestion that Jahangiri's job performance suffered because of the alleged hostile work environment. Well before the September 2019 incident, Jahangiri's performance deficiencies were noted and he was subject to remediation. Given the absence of pervasive and severe hostility and any evidence of a detrimental effect on Jahangiri's performance, the hostile workplace claim cannot proceed. Count IV will be dismissed.

### V. Count V: Title VII Retaliation

The timeline of events framing the circumstances of the nonrenewal of the Third Year Resident Contract and termination of Jahangiri's employment effectively undermines any plausible retaliation claim. To establish a prima facie case of retaliation under Title VII, Jahangiri must demonstrate "(1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that there was a causal link between the two events." EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005) (citations omitted). Not all employee complaints are protected by Title VII's retaliation provision, and the "[l]aw does not blindly ascribe to race all personal conflicts between individuals of different races." McIver v. Bridgestone Americas, Inc., 42 F.4th 398, 411 (4th Cir. 2022) (quoting Hawkins v. PepsiCo, Inc., 203 F.3d 274, 281 (4th Cir. 2000)). Retaliation claims also follow the McDonnell Douglas burden-shifting framework where Jahangiri maintains the ultimate burden for showing that his nonrenewal was retaliatory. See Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 258 (4th Cir.1998).

18

Jahangiri presents no evidence linking the complaint about his September 2019 suspension with the June 2020 nonrenewal and termination. Indeed, in the months after Jahangiri appealed his suspension, he successfully completed a remediation plan. Not only is there no nexus between the September 2019 incident and the June 2020 decision to end Jahangiri's residency, the lapse of time between these events negates any inference of impermissible retaliation. Jahangiri's alleged protected activity by appealing his suspension in September 2019 and his nonrenewal and termination nine months later are too attenuated to support any causal connection between the two. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005) ("'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse ... action' " often " 'negates any inference that a causal connection exists between the two.' ") (quoting Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)); Clarke v. DynCorp Int'l LLC, 962 F. Supp. 2d 781, 790 (D. Md. 2013) ("a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" (quoting King v. Rumsfeld, 328 F.3d 145, 151 n. 5) (4th Cir. 2003)).

Because there is no genuine issue of material fact in dispute supporting Jahangiri's claim of retaliation, summary judgment must be granted as to Count V.

## VI. Count VI: Breach of Contract

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 267 Va.

612, 619 (2004) (citations omitted). When a contract is clear and unambiguous, it is the court's duty to interpret the contract as written. Winn v. Aleda Constr. Co., 227 Va. 304, 307, 315 S.E.2d 193, 194 (1984). In a breach of contract claim, the parties' contract becomes the law governing the case unless it is repugnant to some rule of law or public policy. Id. The court must construe the contract as written. Virginia adheres to the "'plain meaning' rule: [w]here an agreement is plain on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself. . . . This is so because the writing is the repository of the final agreement of the parties." Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 271 Va. 574, 578, 628 S.E.2d 539, 541 (2006) (quoting D.C. McClain, Inc. v. Arlington Cnty., 249 Va. 131, 135–36, 452 S.E.2d 659, 662 (1995)). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." W.F. Magann Corp. v. Virginia–Carolina Elec. Works, Inc., 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962). "Under Virginia law, conflicting interpretations reveal an ambiguity only where they are reasonable. A 'reasonable' or 'fairly claimed' interpretation is one of two competing interpretations that are 'equally possible' given the text and context of the disputed provision." Erie Ins. Exch. v. EPC MD 15, LLC, 297 Va. 21, 29, 822 S.E.2d 351 (2019) (citations omitted).

### a. 2019-2020 Second Year Resident Contract

Jahangiri claims that LG breached the 2019-2020 Second Year Resident Contract by not providing him sufficient notice of nonrenewal for the third year of the residency program. Jahangiri's claim fails under the plain language of the agreement, which allows LG to provide for notice of nonrenewal up to the end of June, as follows:

> Hospital shall provide notice to the Resident prior to the End Date of this Agreement regarding promotion to the next year of training or graduation from the Program. If the Resident will not be promoted, the Program shall endeavor to provide as much notice as circumstances reasonably allow, prior to the end of this Agreement.

2019-2020 Second Year Residency Contract, ECF No. 48-42, at 3. Consistently, the GME Resident Manual provided that "[a] decision of intent not to renew a resident or fellow's contract should be communicated to the resident/fellow in writing by the program director as soon as practical but not later than prior to the end of the contract year." GME Resident Manual 2019-2020 ECF No. 48-43, at 24. The End Date for the 2019-2020 Second Year Resident Contract was June 30, 2020. 2019-2020 Second Year Residency Contract, ECF No. 48-42, at 1.

After the 2020-2021 Third Year Resident Contract was issued to Jahangiri by the CCC on June 3, 2020, Haney, Janhangiri's clinical team leader, raised concerns with Griffin about Jahangiri's treatment of Lindsay and untruthfulness about patient rounds. On Friday afternoon, June 12, 2020, Griffin, Haney, Lindsay, and Jahangiri met to discuss these issues. On Monday, June 15, 2020, Griffin wrote Jahangiri and advised him of the nonrenewal of the third year of the residency program. At this point, more than two weeks remained in Jahangiri's second year. Under the plain language of the 2019-2020 Second Year Residency Contract,

notice was provided prior to the end of Jahangiri's second year. Given that the meeting to discuss the concerns with Jahangiri's performance was not held until Friday afternoon, June 12, 2020, it cannot be credibly asserted that the notice of nonrenewal, issued on Monday June 15, 2020, was not "as much notice as circumstances reasonably allow." Id.  Accordingly, under the plain terms of the 2019-2020 Second Year Residency Contract, Jahangiri has no actionable claim of breach for failure to provide timely notice.

**b. 2020-2021 Third Year Resident Contract**

It is undisputed that Jahangiri signed the 2020-2021 Third Year Resident Contract and returned it to LG in the early morning hours of June 15, 2020, before Griffin later that day issued the letter advising Jahangiri that his resident position was not being renewed. Because Jahangiri accepted LG's offer to appoint him a third year resident by signing and returning the 2020-2021 Third Year Resident Contract, Jahangiri argues that LG's nonrenewal letter later that day was ineffectual. Jahangiri asserts that once he signed and returned the 2020-2021 Third Year Resident Contract, nonrenewal of that contract was no longer possible, and LG's only recourse was under the termination for cause provisions of the 2020-2021 Third Year Resident Contract.

Jahangiri's rigid interpretation of the contractual rights afforded to LG to manage its residency program by means of the GME Resident Manual and the annual resident contracts does not square with the plain language of the 2020-2021 Third Year Resident Contract and ignores the practical reality that the residency program is three years, requiring successful completion of one before proceeding to the next. Jahangiri's argument that his execution and return of the 2020-2021 Third Year Resident Contract precluded LG from making the decision

not to renew him as a third year resident also ignores the fact that two separate provisions of the Resident Contracts expressly provide that participation in the residency program is contingent upon the resident's satisfactory professional performance.

First, §3.D. of each Resident Contract provides that "continuation and/or promotion of the Resident . . . is contingent upon satisfactory and professional performance by the Resident as determined by the Program Director and faculty, in accordance with policies and procedures in the GME Resident Manual. . . . Hospital is not obligated to renew or extend this Agreement for subsequent training levels in the event that the academic and professional performance by the Resident is determined to be unsatisfactory, subject to the provisions of due process in the GME Resident Manual." 2109-2020 Second Year Resident Contract, ECF No. 48-42, at 3; 2020-2021 Third Year Resident Contract, ECF No. 45-31, at 3. Thus, Jahangiri's participation in the residency program was contingent upon his satisfactory professional performance.

Importantly, the Resident Contract sets the date by which LG must make the promotion decision, and requires it to provide notice to the resident of the decision prior to the end date of the Resident Contract—June 30. Thus, the plain language of the 2019-2020 Second Year Resident Contract allowed LG up until its End Date—June 30, 2020— to provide notice to Jahangiri as to whether he satisfied the requirement of satisfactory professional performance, upon which his continuation in the program was contingent. Jahangiri was provided such notice on June 15, 2020, squarely within the terms of the 2019-2020 Second Year Resident Contract and the GME Resident Manual 2109-2020. Adoption of Jahangiri's

argument would require the court to read this End Date notice provision out of the Resident Contract, which the court cannot do.

Second, §2.C. of each Resident Contract provides that "Resident understands and acknowledges that **this Agreement and Program participation is contingent upon meeting** pre-employment requirements established by state and federal laws, and **requirements established by Hospital prior to the Start Date** . . ." 2109-2020 Second Year Resident Contract, ECF No. 48-42, at 1; 2020-2021 Third Year Resident Contract, ECF No. 45-31, at 1 (emphasis added). This language makes it clear that the 2020-2021 Third Year Resident Contract, signed and returned by Jahangiri early on the morning of June 15, 2020, also was expressly contingent upon his "meeting . . . requirements established by the Hospital prior to the Start Date." Id. The Start Date of the 2020-2021 Third Year Resident Contract was July 1, 2020. Plainly, prior to that date, LG made the determination that the professional problems experienced by Jahangiri in May 2020 required nonrenewal of his residency program and termination from employment. As such, LG's actions were consistent with, and not in breach of, Jahangiri's 2020-2021 Third Year Resident Contract, which was contingent upon him meeting LG's requirements up to July 1, 2020.

The court has considered whether the "Pre-Employment Requirements" caption preceding the contingency clause in §2.C. of the 2020-2021 Third Year Resident Contract limits application of that clause to the period of time prior to July 1, 2018, when Jahangiri started his employment with LG as a first year resident. Such an interpretation, however, would require the court to ignore the complete text of the contingency clause which requires Jahangiri to meet "pre-employment requirements established by state and federal law, **and**

24

**requirements established by the Hospital prior to the Start Date.**" Id. (emphasis added).

As "Start Date" is defined in the 2020-2021 Third Year Resident Contract to be July 1, 2020,

both Jahangiri's 2020-2021 Resident Contract and his participation in the LG residency

program were expressly contingent upon him meeting LG's requirements prior to July 1, 2020.

On June 15, 2020, Griffin wrote Jahangiri that despite efforts at remediation, he had

"failed to make substantial, sustained improvements in [his] performance." Griffin June 15,

2020 Letter, ECF No. 45-32. As reflected in this letter, LG determined that Jahangiri's

performance in the residency program fell short of meeting the "requirements established by

the Hospital prior to the Start Date," which for the 2020-2021 Third Year Resident Contract

was July 1, 2020. Because LG's decision to not extend Jahangiri's residency into the third year

was timely and otherwise complied with §3.D. of the 2019-2020 Second Year Resident

Contract, and because §2.C. rendered the 2020-2021 Third Year Resident Contract expressly

contingent on Jahangiri meeting all of LG's requirements prior to July 1, 2020, LG retained

the right under the Resident Contracts to assess Jahangiri's professional performance and

provide notice of his continuation in the residency program up until July 1, 2020, the Start

Date of the 2020-2021 Third Year Resident Contract. Jahangiri's argument that LG's ability

to assess his professional performance and provide him notice of nonrenewal ended when the

CCC issued him the 2020-2021 Third Year Resident Contract on June 4, 2020, which he signed

and returned on June 15, 2020, disregards the expressly contingent nature of the Resident

Contracts and LG's express contractual ability to decide not to continue Jahangiri's residency

prior to July 1, 2020. As such, based on the plain meaning of the express terms of the Resident

Contracts, Jahangiri has no actionable breach of contract claim. Accordingly, summary judgment must be granted for LG on Count VI.

## VII. Conclusion

For the foregoing reasons, LG's motion for summary judgment is **GRANTED**. No genuine issue of material fact exists to support Jahangiri's claim that he was discriminated against based upon his race, national origin, or religion. Further, there is no evidence that Jahangiri was subjected to an illegally hostile work environment or retaliation. Finally, Jahangiri's participation in the LG residency program was expressly contingent on his professional performance, and LG was within its rights under the Resident Contracts to discontinue his participation in the residency program and terminate his employment for failing to meet the Hospital's requirements prior to July 1, 2020.

Accordingly, defendant LG's motion for summary judgment will be **GRANTED** in its entirety and this case **DISMISSED**. An appropriate order will be entered.

Entered:  December 19, 2022

Digitally signed by Michael F.
Urbanski       Chief U.S.
District Judge
Date: 2022.12.19 17:01:20
-05'00'

Michael F. Urbanski
Chief United States District Judge